**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

LORENZO ANTONIO CANO,

        Plaintiff,

     v.                         Civ. No. 21-257 KK

KILOLO KIJAKAZI, Acting Commissioner
the Social Security Administration,

        Defendant.

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Lorenzo Antonio Cano's Motion to Reverse and Remand for Rehearing with Supporting Memorandum (Doc. 24), filed December 16, 2021. The Acting Commissioner of the Social Security Administration ("Commissioner") filed a response in opposition on March 16, 2022, and Mr. Cano filed a reply in support on April 4, 2022. (Docs. 28, 30.) Having meticulously reviewed the parties' submissions, the entire record, and the relevant law, and being otherwise sufficiently advised, the Court finds that Mr. Cano's Motion is well-taken and should be GRANTED.

### I.    BACKGROUND AND PROCEDURAL HISTORY

Mr. Cano is a 28-year-old high school graduate who attended special education classes and has worked for brief periods as an auto detailer, yard worker, changing room installer, and cook. (AR 64, 74, 191-94, 201.[2]) Mr. Cano alleges disability beginning on December 10, 2018, due to schizophrenia, anxiety, and attention-deficit/hyperactivity disorder. (AR 64-65.) He brings this

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 35.)

[2] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on August 16, 2021. (Doc. 16.)

action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking reversal of the Commissioner's decision denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. (Doc. 24 at 1-2.)

### A. Procedural History

Mr. Cano applied for SSI on December 10, 2018, alleging disability onset as of that date. (AR 63-64.) His claim was denied initially on February 14, 2019, and on reconsideration on June 10, 2019. (AR 63, 76.) At Mr. Cano's request, Administrative Law Judge ("ALJ") Cole Gerstner held a telephonic hearing on August 18, 2020, at which Mr. Cano was represented by counsel. (AR 30-62.) Mr. Cano, his mother, and an impartial vocational expert ("VE") testified at the hearing. (AR 30-62.) On October 21, 2020, the ALJ issued an unfavorable decision. (AR 10-18.) Mr. Cano appealed the ALJ's decision to the Appeals Council, which denied his request for review on January 22, 2021. (AR 1–5.) His appeal to this Court followed. (Doc. 1.)

### B. Mr. Cano's Mental Health History[3]

Mr. Cano suffers from bipolar-type schizoaffective disorder and anxiety, (AR 12, 548), and has also been diagnosed with other mental health conditions including depression, mild intellectual developmental disability, polysubstance use disorder, akathisia,[4] post-traumatic stress disorder ("PTSD"), and psychosis. (*See, e.g.*, AR 293, 545, 548, 639, 917, 1111.)

---

[3] Mr. Cano makes no arguments regarding any physical impairments on appeal. (Docs. 24, 30; AR 55.) The Court will therefore limit its discussion to record evidence regarding Mr. Cano's mental impairments.

[4] Approximately 24 % of people who take medication for schizophrenia have chronic akathisia, which is a disorder characterized by the inability to remain still, mainly in the lower extremities. *See* https://my.clevelandclinic.org/health/diseases/23954-akathisia (last accessed Nov. 4, 2022).

1.  *Mental Health Records*

Mr. Cano presented to the Memorial Medical Center Emergency Department ("MMC ED") twice in November 2018. On the first occasion, law enforcement took him to the MMC ED for medical clearance. (AR 290.) Hospital staff noted his "[a]ltered mental status," observed that he appeared to be "intoxicated likely on a drug," and discharged him to law enforcement. (AR 290-91.) On the second occasion, Mr. Cano presented with depression. (AR 293.) Hospital staff noted his "depressed" mood and "very flat" affect and that he tested positive for cannabis, but found his condition to be "[s]table" and discharged him. (AR 293-94, 298.)

Mr. Cano was admitted to Mesilla Valley Hospital ("MVH")[5] from November 25, 2018, to December 10, 2018, for, *inter alia*, being out of touch with reality, responding to internal stimuli, throwing chairs, and behaving aggressively. (AR 312.) His drug screen on admission was positive for cannabis. (AR 312.) Due to his refusal to take prescribed medications, a state court appointed a treatment guardian for Mr. Cano on December 4, 2018, finding that he was incapable of "making his own mental health treatment decisions" or "providing informed consent." (AR 175-77.) During this stay at MVH, Mr. Cano was treated for risk of restraint due to aggressive behavior, mood instability, aggression, depressed mood with suicidal ideation, unspecified schizophrenia, cannabis use disorder, and sleep pattern disturbance. (AR 313.) On discharge, MVH staff diagnosed Mr. Cano with unspecified schizophrenia and cannabis use disorder, prescribed haloperidol[6] for

---

[5] MVH is a psychiatric hospital. *See* https://mesillavalleyhospital.com/ (last accessed Nov. 4, 2022).

[6] Haloperidol, or Haldol, "is used to treat psychotic disorders (conditions that cause difficulty telling the difference between things or ideas that are real and things or ideas that are not real)." https://medlineplus.gov/druginfo/meds/a682180.html (last accessed Nov. 4, 2022).

psychosis and benztropine[7] for extrapyramidal side effects,[8] and instructed Mr. Cano to obtain aftercare through its partial hospitalization program ("PHP")[9] and La Clinica de Familia. (AR 313-14, 544.)

Mr. Cano was readmitted to MVH from January 10 to January 15, 2019, because in the PHP, he expressed suicidal ideation, and reported anger and aggression toward other patients and the belief that everyone was plotting against him. (AR 1171.) During this stay, Mr. Cano was treated for sleep pattern disturbance, depressed mood with suicidal and homicidal ideation, history of polysubstance abuse, and bipolar-type schizoaffective disorder. (AR 1171.) Hospital staff noted Mr. Cano's psychomotor agitation, akathisia in the form of constant pacing, anxious and labile mood and affect, disorganized thought process, loose associations, impaired memory, poor judgment, and significant paranoia, and recorded his reports of racing thoughts, visual hallucinations, aggressive urges, and "a problem holding a job[.]" (AR 545-47.) On discharge, hospital staff diagnosed him with severe bipolar-type schizoaffective disorder, prescribed haloperidol, benztropine, hydroxyzine,[10] and trazodone,[11] and instructed him to obtain aftercare through La Clinica de Familia. (AR 1171-72.)

---

[7] Benztropine, or Cogentin, is used to treat tremors caused by medications, Parkinson's disease, or other medical problems. https://medlineplus.gov/druginfo/meds/a682155.html (last accessed Nov. 4, 2022).

[8] Extrapyramidal side effects are drug-induced movement disorders, including akathisia. *See* D'Souza, *et al.*, *Extrapyramidal Symptoms* (Aug. 1, 2022), at https://www.ncbi.nlm.nih.gov/books/NBK534115/ (last accessed Nov. 4, 2022).

[9] "PHP provides intense and highly-structured care that allows patients to return home every night after treatment[.]" https://mesillavalleyhospital.com/programs-and-services/adults/partial-hospitalization-program/ (last accessed Nov. 7, 2022).

[10] Hydroxyzine, or Vistaril, is used "to relieve anxiety and tension." https://medlineplus.gov/druginfo/meds/a682866.html (last accessed Nov. 4, 2022).

[11] Trazodone, or Oleptro, is used to treat depression. https://medlineplus.gov/druginfo/meds/a681038.html (last accessed Nov. 4, 2022).

Mr. Cano received mental health treatment from La Clinica de Familia at approximately 142 appointments between January 17, 2019, and August 26, 2020. These appointments included: (a) 17 psychotherapy sessions with Deanna Jaramillo, LMSW, between January 17, 2019, and August 21, 2020,[12] (AR 377-79, 633-46, 911-15, 922-24, 928-30, 934-36, 1076-79, 1027-30, 1036-42, 1091-1106, 1127-32, 1204-08, 1266-68, 1306-08, 1462-64, 1593-99, 1662-63); (b) seven psychiatric medication management appointments with Malathi Pilla, M.D., between February 1, 2019, and October 11, 2019, (AR 624-27, 916-18, 925-27, 1122-23, 1124-26, 1133-36, 1137-39); (c) ten psychiatric medication management appointments with Ghirmay Ghebreslasse, D.N.P., between November 11, 2019, and July 21, 2020, (AR 1021-26, 1031-35, 1061-65, 1071-75, 1080-85, 1086-90, 1108-12, 1113-17, 1118-21, 1582-87); (d) 81 in-person Psychosocial Rehabilitation ("PSR") sessions with Rehabilitation Instructor JoAnne Amador and/or Case Manager Orlando Yniguez between November 13, 2019, and March 19, 2020, generally lasting about four hours and forty-five minutes per session, (AR 1209-14, 1223-54, 1260-65, 1269-72, 1279-1305, 1309-21, 1327-36, 1352-53, 1356-60, 1364-78, 1380-81, 1389-99, 1406-16, 1419-23, 1427-40, 1446-61, 1465-92); (e) one group psychotherapy session with Kaitlyn Mead, L.M.H.C., on January 16, 2020, and another with Chinyelu Obi, L.M.S.W., on January 20, 2020, (AR 1354-55, 1361-63); (f) five telephonic Community Counseling and Supportive Services ("CCSS") visits with Ms. Amador, Rehabilitation Instructor Oscar Lopez, or Case Manager Jessica Sheen, between March

---

[12] The ALJ found that Mr. Cano "was discharged from therapy" on April 16, 2020, "as the family was no longer interested." (AR 16.) However, the record reflects that Mr. Cano continued to attend individual psychotherapy appointments with Ms. Jaramillo through at least August 21, 2020. (AR 1027-30, 1036-42, 1593-99, 1662-63.) Mr. Cano *was* discharged from telephonic Community Counseling and Supportive Services visits on April 16, 2020, "due to [Psychosocial Rehabilitation] re-engaging in telephonic group sessions." (AR 1520.) However, not only did Mr. Cano continue to attend individual psychotherapy after April 16, 2020, but also, as anticipated, he began to attend telephonic Psychosocial Rehabilitation sessions the following month and continued to do so through at least August 26, 2020. (AR 1538-43, 1550-81, 1588-92, 1600-01, 1635, 1664.)

30, 2020, and April 7, 2020, (AR 1047-50, 1051-60, 1066-70, 1517-19); and, (g) 19 telephonic PSR sessions with Ms. Amador or Angela Fresquez, CCSS Case Manager, between May 11, 2020, and August 26, 2020.[13] (AR 1538-43, 1550-81, 1588-92, 1600-01, 1635, 1664.) Mr. Cano also had an appointment with Yeny Bravo Pajuelo, M.D., a primary care physician at La Clinica de Familia, on February 4, 2019, at which Dr. Pajuelo reviewed Mr. Cano's psychiatric medications. (AR 374-76.)

### 2.  Hearing Testimony

At his August 18, 2020 hearing, Mr. Cano testified that he lived with his father until his father died on August 7, 2019, and since then he has lived with his mother, who takes care of him, and his stepfather. (AR 43-44.) He stated that he no longer has a driver's license because it was suspended for child support payments. (AR 45.)

Mr. Cano testified that he has racing thoughts, "paranoia of somebody following," "stalking," and "watch[ing]" him, and thoughts that he is "just a government experiment." (AR 41.) He added that he "pace[s] back and forth" and "can't stop walking." (AR 41-42.) He indicated that within the last year his mother has told him he has "been going out for walks" that he does not remember. (AR 51.) According to Mr. Cano, he wakes up at least three times a night because he hears voices "sort of mock[ing]" him. (AR 52.) He stated that he sees a red-eyed shadow that always follows him, but he has not told DNP Ghebreslasse about the shadow "because every time I tell him something he just prescribes me more medication, and I'm afraid that he might overprescribe me one day and I might die." (AR 52-53.)

---

[13] The telephonic PSR sessions Mr. Cano attended lasted from 30 minutes to an hour per session and were thus significantly shorter than the in-person PSR sessions he attended. (AR 1538-43, 1550-81, 1588-92, 1600-01, 1635, 1664.)

Mr. Cano testified that he has "been trying [his] best to be compliant with the medications" but he "sometimes forget[s] them at night." (AR 53-54.) He also testified that there were two "period[s] of time" when he did not take his medication as prescribed but he was "not too sure" the last time he was "off [his] meds." (AR 42, 49.) He added that he gets "[his] shot" at "the clinic" and has asked DNP Ghebreslasse to give him shots for all of his medications "because [he]'ll forget."[14] (AR 54.) He stated that his mother reminds him to take his other medications but sometimes she leaves him with his younger sister, who does not remind him. (AR 54.) He further stated that he feels like his medications are keeping him "stable to a point where [he's] not having as much blackouts, and [he's] not having irrational thoughts," and without them he "would go haywire." (AR 54-55.) According to Mr. Cano, his medications make him feel like he is "half awake, half asleep." (AR 51.)

3. *Medical Source Opinions and Prior Administrative Medical Findings*[15]

On February 8, 2019, state agency non-examining psychological consultant Mark McGaughey, Ph.D., found that Mr. Cano is moderately limited in his ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for "extended periods"[16]; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number

---

[14] The medication La Clinica de Familia gives Mr. Cano by injection is haloperidol. (*See, e.g.*, AR 1221-22.)

[15] "A prior administrative medical finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 416.913(a)(5).

[16] The agency defines "extended periods" as "the approximately 2-hour segments between arrival and first break, lunch, second break, and departure." POMS DI § 25020.010(B)(2)(a). The Program Operations Manual System, or POMS, "is a set of policies issued by the Social Security Administration to be used in processing claims." *Anders v. Berryhill*, 688 F. App'x 514, 520 & n.2 (10th Cir. 2017) (quotation marks and brackets omitted). The Court must defer to POMS provisions unless it determines they are arbitrary, capricious, or contrary to law. *Id.*

and length of rest periods; (4) accept instructions and respond appropriately to criticism from supervisors; (5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (6) respond appropriately to changes in the work setting; and, (7) set realistic goals or make plans independently of others. (AR 72-73.) Dr. McGaughey additionally explained that,

> with medication compliance[17] and remaining substance free, the claimant retains the capacity to understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for a significant length of time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting.

(AR 73.) On June 7, 2019, state agency non-examining consultant Kathleen Padilla, Ph.D., made the same findings, stating that the record evidence "demonstrate[d] no significant change in level of functioning compared to initial eval[uation]." (AR 86-88.)

On October 11, 2019, treating provider Dr. Pilla recorded that she had filled in "disability paperwork" in which she opined that Mr. Cano "can follow simple instructions," but his history of substance use "can sometimes impair his thought process." (AR 1122.) Dr. Pilla also wrote that Mr. Cano's mother expressed disagreement with her opinion that Mr. Cano can follow simple instructions, and that Mr. Cano told "the staff that he threw the paperwork." (AR 1122.)

Finally, in a July 31, 2020 letter supporting Mr. Cano's disability application, treating provider DNP Ghebreslasse assessed that Mr. Cano "requires assistance with activit[ies] of daily living," noting that since his father died, his mother "is assisting him, taking [him] to his doctor's

---

[17] The ALJ stated that he incorporated "a reduced ability to focus/maintain attention or concentration" into Mr. Cano's RFC due to Mr. Cano's "less than consistent [medication] compliance." (AR 17.) However, the ALJ's RFC limiting Mr. Cano to simple, routine tasks and simple work-related decisions appears to track the opinions of Drs. McGaughey and Padilla regarding Mr. Cano's ability to maintain attention and concentration "with medication compliance." (AR 13, 73, 88.)

appointments, washing his cloth[e]s, cooking his meals[,] and cleaning his house[.]" (AR 1194.)
In support of his assessment, DNP Ghebreslasse referred to Mr. Cano's psychiatric diagnoses of
bipolar-type schizoaffective disorder, generalized anxiety disorder, alcohol abuse in remission,
and uncomplicated cannabis abuse, and his prescribed psychiatric medications of haloperidol,
benztropine, trazodone, sertraline,[18] and quetiapine.[19] (AR 1194.)

### C.   The ALJ's Decision

In his October 21, 2020 decision, the ALJ applied the Commissioner's five-step evaluation
process.[20] (AR 10-18.) At step one, the ALJ determined that Mr. Cano "has not engaged in
substantial gainful activity since December 10, 2018, the application date." (AR 12.) At step two,
the ALJ found that Mr. Cano has the severe impairments of schizoaffective disorder and anxiety,
and that his substance abuse disorders are in remission and non-severe. (AR 12.) At step three, the

---

[18] Sertraline, or Zoloft, is used to treat depression, obsessive-compulsive disorder, panic attacks, PTSD, and social anxiety disorder. https://medlineplus.gov/druginfo/meds/a697048.html (last accessed Nov. 4, 2022).

[19] Quetiapine, or Seroquel, "is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions)." https://medlineplus.gov/ druginfo/meds/a698019.html (last accessed Nov. 4, 2022).

[20] The five-step sequential evaluation process requires the ALJ to determine whether:

   1)  the claimant engaged in substantial gainful activity during the alleged period of disability;

   2)  the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement;

   3)  any such impairment meets or equals the severity of a listed impairment described in Appendix 1 of 20 C.F.R. Part 404, Subpart P;

   4)  the claimant can return to his past relevant work; and, if not,

   5)  the claimant is able to perform other work in the national economy, considering his residual functional capacity, age, education, and work experience.

20 C.F.R. § 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

ALJ found that Mr. Cano's impairments do not meet or medically equal the severity of one of the Listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (AR 12-13.)

At step four,[21] the ALJ found that Mr. Cano has the residual functional capacity ("RFC")

> to perform a full range of work at all exertional levels but with the following non-exertional limitations: The claimant is able to perform simple, routine tasks. The claimant is able to perform simple work-related decisions. The claimant is able to interact occasionally with supervisors, co-workers, and with the public. The claimant is able to make simple work-related decisions.

(AR 13.) The ALJ then determined that Mr. Cano has no past relevant work. (AR 17.)

At step five, the ALJ found that, "[c]onsidering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform." (AR 17.) In making this determination, the ALJ relied on the VE's testimony that a hypothetical individual of Mr. Cano's age and with his education, work experience, and assigned RFC would be able to perform the representative occupations of janitor, hand packager, garment sorter, and housekeeper, all of which are categorized as unskilled and light or medium in exertional demand. (AR 17-18.) The ALJ therefore concluded that Mr. Cano "has not been under a disability, as defined in the Social Security Act, since December 10, 2018, the date the application was filed." (AR 18.)

## II.   STANDARD OF REVIEW

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied correct legal

---

[21] Step four involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine what is "the most [the claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. § 416.945(a)(1). This is the claimant's residual functional capacity. *Id.* Second, the ALJ must determine the physical and mental demands of the claimant's past work. *Winfrey*, 92 F.3d at 1023. Third, the ALJ must determine whether the claimant is capable of meeting those demands given his residual functional capacity. *Id.* A claimant who can perform his past relevant work is not disabled. 20 C.F.R. § 416.920(f).

standards to evaluate the evidence. 42 U.S.C. §§ 405(g); 1383(c)(3); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).

The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record. *Hamlin*, 365 F.3d at 1214. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10

(10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

### III.   DISCUSSION

Mr. Cano argues that the ALJ erred in assessing Mr. Cano's RFC because he weighed the opinions of DNP Ghebreslasse and Dr. Pilla improperly and failed to incorporate all of the functional limitations Drs. McGaughey and Padilla found. (Doc. 24 at 13-23.) Mr. Cano further argues that the ALJ erred by failing to consider the functional limitations arising from Mr. Cano's depression and by improperly assessing his subjective complaints. (*Id.* at 23-27.) The Commissioner responds that, in assessing Mr. Cano's RFC, the ALJ reasonably considered Mr. Cano's severe impairments and subjective complaints, correctly determined that DNP Ghebreslasse's assessment was not a medical opinion, properly weighed Dr. Pilla's opinion, and adequately accounted for the findings of Drs. McGaughey and Padilla. (Doc. 28 at 6-14.) For the reasons discussed below, the Court finds that the ALJ erred in his consideration of the opinions of DNP Ghebreslasse and Dr. Pilla, and that remand is therefore warranted.[22]

The agency's regulations[23] define a "medical opinion" as "a statement from a medical source about what [a claimant] can still do despite [his] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions in" various abilities, including the "ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures[.]" 20 C.F.R. § 416.913(a)(2). In other

---

[22] The Court will not address Mr. Cano's remaining claims of error, because they may be affected on remand. *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

[23] In 2017, the agency revised its regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Because Mr. Cano filed his claim in December 2018, (AR 63-64), the revised regulations apply to this matter.

words, "[a] medical opinion is a provider's judgment about the nature and severity of the claimant's [functional] limitations, or any information about what activities the claimant could still perform." *Robert S. v. Kijakazi*, No. 21-cv-231, 2022 WL 3908780, at *3 (D.N.M. Aug. 30, 2022) (quotation marks and brackets omitted) (quoting *Cowan v. Astrue*, 552 F.3d 1182, 1189 (10th Cir. 2008)). Under the regulations, an ALJ must articulate in his decision how persuasive he finds all of the medical opinions in a claimant's case record. 20 C.F.R. § 416.920c(b).

Addressing the agency's "articulation requirements," the regulations provide that

[t]he factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions … to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions … in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate[.]

20 C.F.R. § 416.920c(b)(2). "[T]he factors in paragraphs (c)(3) through (c)(5)" are the source's "[r]elationship with the claimant," the source's "[s]pecialization," and "other factors that tend to support or contradict a medical opinion[.]" 20 C.F.R. § 416.920c(c)(3)-(c)(5).

As the Tenth Circuit has explained,

"[s]upportability" examines how closely connected a medical opinion is to the evidence and the medical source's explanations: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), the more persuasive the medical opinions will be." [20 C.F.R.] § 404.1520c(c)(1); *id.* § 416.920c(c)(1). "Consistency," on the other hand, compares a medical opinion to the evidence: "The more consistent a medical opinion(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) will be." *Id.* § 404.1520c(c)(2); *id.* § 416.920c(c)(2).

*Zhu v. Comm'r, SSA*, 2021 WL 2794533, at *6 (10th Cir. Jul. 6, 2021), *cert. denied*, — U.S. —, 142 S. Ct. 2838 (Jun. 21, 2022) (brackets and ellipses omitted).

13

Caselaw likewise provides that, "when assessing a plaintiff's RFC, an ALJ must explain what weight is assigned to each [medical source] opinion and why." *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1157 (D.N.M. 2016). The ALJ must provide adequate reasons for the weight he gives a medical source opinion. *Frantz v. Astrue*, 509 F.3d 1299, 1302-03 (10th Cir. 2007); *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Haga v. Astrue*, 482 F.3d 1205, 1207-09 (10th Cir. 2007); *see generally Givens v. Astrue*, 251 F. App'x 561, 568 (10th Cir. 2007) (ALJ must provide "adequate reasons" for rejecting significantly probative medical evidence concerning claimant's RFC). Where the ALJ does not adequately support his rejection of a medical source opinion concerning the claimant's RFC, the case must be remanded for the ALJ to do so. *Frantz*, 509 F.3d at 1302-03; *Haga*, 482 F.3d at 1207-09.

Moreover, "all the ALJ's required findings must be supported by substantial evidence, and he must consider all relevant medical evidence in making those findings." *Grogan*, 399 F.3d at 1262 (quotation marks and citations omitted). Thus, the ALJ's reasons for rejecting a medical opinion regarding the claimant's functional limitations must be supported by substantial evidence, and the ALJ must consider all relevant medical evidence in weighing the opinion. *Id.*; *see generally, e.g., Langley*, 373 F.3d at 1116 (reversing ALJ's decision where, *inter alia*, ALJ's reasons for rejecting medical opinions were not or did not appear to be supported by substantial evidence). Here, the ALJ's treatment of the opinions of DNP Ghebreslasse and Dr. Pilla does not satisfy the foregoing standards.

### A.  The ALJ did not give an adequate reason for rejecting DNP Ghebreslasse's opinion.

As noted in Section I.B.3., *supra*, on July 31, 2020, DNP Ghebreslasse wrote a letter in which he assessed that Mr. Cano "requires assistance with activit[ies] of daily living," providing the specific examples of Mr. Cano's mother taking him to appointments, and washing clothes,

cooking, and cleaning for him. (AR 1194.) In support of this assessment, DNP Ghebreslasse listed Mr. Cano's psychiatric diagnoses of bipolar-type schizoaffective disorder and generalized anxiety disorder and his prescribed psychiatric medications of haloperidol, benztropine, trazodone, sertraline, and quetiapine. (AR 1194.)

The ALJ rejected DNP Ghebreslasse's assessment, stating: "[t]he undersigned finds Ms. [sic] Ghebreslasses' [sic] opinion is not persuasive or supported by the medical evidence because it is not an opinion, just a diagnosis." (AR 16.) The ALJ provided no further explanation for rejecting the assessment. (AR 16.) However, the ALJ's brief justification for rejecting DNP Ghebreslasse's assessment is not only internally inconsistent and a non sequitur, but also legally erroneous as explained below.

It is true that DNP Ghebreslasse did not use the agency's specialized terminology or parse and separately rate each of Mr. Cano's work-related mental limitations. (AR 1194.) Nevertheless, his assessment that Mr. Cano requires assistance with basic activities such as transportation, laundry, cooking, and cleaning, with reference to his psychiatric diagnoses and medications, is "a statement from a medical source about what [Mr. Cano] can still do despite [his] impairment(s)" and whether Mr. Cano has "one or more impairment-related limitations or restrictions" in his "ability to perform mental demands of work activities." 20 C.F.R. § 416.913(a)(2). First, the assessment indicates limitations or restrictions in what Mr. Cano can still do. (AR 1194.) Second, DNP Ghebreslasse's reference to Mr. Cano's psychiatric diagnoses and medications links the opined limitations to Mr. Cano's mental impairments and abilities. (AR 1194.)

Finally, while transportation, laundry, cooking, and cleaning can be "activit[ies] of daily living," (AR 1194), they can also be "work activities." 20 C.F.R. § 416.913(a)(2). Indeed, in this case, two of the four representative occupations on which the ALJ relied to deny Mr. Cano's claim

of disability were "Janitor" and "Housekeeper," and cleaning is plainly a work activity central to both. (AR 17-18.) Also, transportation to work is likely to be necessary for nearly any unskilled occupation. In sum, as "a provider's judgment about the nature and severity of [Mr. Cano's functional] limitations" and "information about what activities [Mr. Cano] could still perform," DNP Ghebreslasse's assessment qualifies as a medical opinion under the agency's regulations, and the ALJ erred in finding otherwise.[24] *Robert S.*, 2022 WL 3908780 at *3; *cf., e.g., Anderson v. Kijakazi*, No. 21cv34, 2022 WL 2914521, at *4 (D.N.M. July 25, 2022) (provider's finding related to maximum weight claimant could still lift was medical opinion).

In addition, in rejecting DNP Ghebreslasse's opinion, the ALJ failed to explain why he discounted considerable and significantly probative evidence supporting it. This includes evidence that, during the relevant period:

- Mr. Cano had a court-appointed treatment guardian because a state court found that he was incapable of "making his own mental health treatment decisions" or "providing informed consent," (AR 175-77, 1582-87);

- Mr. Cano required approximately six days of in-patient treatment and 29 days of PHP at a psychiatric hospital, (AR 313-14, 544-49, 1171-72);

- Mr. Cano had ongoing visual and auditory hallucinations, particularly when he did not take his medications, (AR 52-53, 624, 641, 1080, 1086-90);

- Mr. Cano was unable to stay still and persistently paced back and forth, including at appointments, (AR 41-42, 378, 624, 923-24, 929-30, 936, 1330, 1354, 1365, 1415, 1432, 1435, 1468);

- Mr. Cano's providers frequently noted abnormal findings on mental status examinations and screenings, including anxious, depressed, or flat mood, restricted, constricted, anxious,

---

[24] Moreover, to the extent the ALJ was unable to determine how DNP Ghebreslasse's opinion correlated with the agency's specialized terminology regarding work-related mental functions, the Court notes that DNP Ghebreslasse specifically expressed his willingness to provide further information, (AR 1194); and, an ALJ has a duty to develop the record. *See Thompson v. Sullivan*, 987 F.2d 1482, 1492 (10th Cir. 1993) (ALJ's "duty to develop the record pertains even if the claimant is represented by counsel"); *Baker v. Bowen*, 886 F.2d 289, 292 (10th Cir. 1989) (noting agency's "important burden of fully and fairly developing the record").

or dysphoric affect, guarded or withdrawn behavior, unreliability, limited judgment, limited insight, and below average intellect, (AR 626, 641, 917, 926, 1024, 1034, 1036, 1061, 1064, 1066, 1071, 1074, 1080, 1083, 1086, 1089, 1108, 1111, 1120-21, 1125, 1128, 1135, 1138, 1141, 1205, 1593);

- Mr. Cano either lived with, or received substantial assistance with activities of daily living from, a parent, (AR 43-44, 211-18, 925, 1031, 1059, 1067, 1095-96, 1130);

- Mr. Cano struggled with activities of daily living such as remembering personal hygiene, making a budget, getting to appointments, taking medications, or following doctor's or pharmacist's instructions, (AR 1068, 1072, 1085, 1095, 1352); and,

- Mr. Cano's providers observed that he often had difficulty participating in simple activities such as group discussions, drawing, watching a funny movie, or coloring Valentine's Day decorations. (AR 1240-41, 1288-89, 1294-95, 1318, 1329-32, 1365, 1369, 1372, 1419, 1422, 1429, 1463-64, 1468, 1471, 1477-78, 1601.)

Elsewhere in his decision, the ALJ did find that Mr. Cano's "medications and treatment are effective when utilized [with] no significant or ongoing adverse side effects," and that "with treatment [Mr. Cano's] symptoms had improved." (AR 15, 17.) But even if the Court were to construe these findings as an explanation for rejecting the significantly probative evidence supporting DNP Ghebreslasse's opinion, the explanation would be inadequate. First, in relying on the effects of Mr. Cano's medications, the ALJ failed to explain why he rejected significantly probative evidence of adverse side effects that would likely impede Mr. Cano's ability to work, *i.e.*, akathisia and unusual drowsiness and fatigue.[25] (AR 41-42, 51, 378, 545, 624, 923-24, 929-30, 936, 1021, 1240, 1289, 1330, 1354, 1365, 1415, 1422, 1432, 1435, 1468, 1477.)

---

[25] Akathisia is a common side effect of haloperidol. https://my.clevelandclinic.org/health/diseases/23954-akathisia (last accessed Nov. 7, 2022); https://www.mayoclinic.org/drugs-supplements/haloperidol-oral-route/side-effects/drg-20064173 (last accessed Nov. 7, 2022). Unusual fatigue is a common side effect of trazodone. https://www.mayoclinic.org/drugs-supplements/trazodone-oral-route/side-effects/drg-20061280 (last accessed Nov. 7, 2022). Unusual sleepiness or drowsiness is a known side effect of sertraline and a common side effect of quetiapine. https://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/side-effects/drg-20065940 (last accessed Nov. 7, 2022); https://www.mayoclinic.org/drugs-supplements/quetiapine-oral-route/side-effects/drg-20066912 (last accessed Nov. 7, 2022).

Second, in relying on the effects of Mr. Cano's treatment, the ALJ failed to explain why he discounted uncontroverted evidence suggesting that this treatment would also likely impede Mr. Cano's ability to work. (AR 17.) Specifically, uncontroverted evidence indicates that, in the less than two years between Mr. Cano's alleged onset date and the ALJ's decision, Mr. Cano was hospitalized for six days, participated in 29 days of "partial hospitalization," and attended approximately 142 out-patient mental health appointments, over half of which lasted nearly five hours per session. *See* Section I.B.1., *supra*. At a minimum, the unusually intensive and time-consuming nature of Mr. Cano's treatment raises a serious question about his ability to "maintain regular attendance and be punctual within customary tolerances" and "complete a normal workday and workweek without interruptions from psychologically based symptoms," both requirements that are "usually strict" in unskilled work.[26] POMS DI § 25020.010(B)(3); *see Kim J. H. v. Saul*, No. 18-cv-2736, 2020 WL 872308, at *9 (D. Minn. Jan. 28, 2020) ("Absenteeism from work resulting from a claimant's need for treatment may constitute evidence that such claimant is unable to perform work activity on a regular and continuing basis or on an equivalent schedule.") (brackets omitted), *report and recommendation adopted*, No. 18-cv-2736, 2020 WL 869963 (D. Minn. Feb. 21, 2020); *cf. Razo v. Colvin*, 663 F. App'x 710, 717 (10th Cir. 2016) (ALJ did not err in declining to limit RFC based on claimant's alleged "need to take time off work for medical appointments" where claimant did not "substantiate his claim with the medical records"). For all of these reasons, the ALJ failed to adequately explain his rejection of DNP Ghebreslasse's opinion, and remand is warranted.

---

[26] Notably in this regard, the VE confirmed that being "off task ten percent of the day" or "missing more than one day of work on a monthly basis regularly" would be "job preclusive" for a person of Mr. Cano's age and with his education, work experience, and assigned RFC. (AR 57.)

**B.     The ALJ erred in his consideration of Dr. Pilla's opinion.**

As noted in Section I.B.3., *supra*, on October 11, 2019, Dr. Pilla recorded that she filled in

disability paperwork in which she opined that Mr. Cano "can follow simple instructions," but his

history of substance use "can sometimes impair his thought process." (AR 1122.) Dr. Pilla also

wrote that Mr. Cano's mother expressed disagreement with her opinion that Mr. Cano can follow

simple instructions, and that Mr. Cano told "the staff that he threw the paperwork." (AR 1122.) In

his decision, the ALJ wrote that he "considered Dr. Pilla's opinion that [Mr. Cano] could perform

simple work" and found it to be "persuasive and supported by the medical evidence." (AR 16.)

However, there is no evidence in the record that Dr. Pilla opined that Mr. Cano can perform simple

work.

Moreover, the ability about which Dr. Pilla actually opined—*i.e.*, the ability to follow

simple instructions—is just one of many work-related mental abilities encompassed in the ability

to perform simple work. *See* POMS DI § 25020.010(A), (B). Other mental abilities needed to

perform such work include the ability to:  (a) remember work-like procedures; (b) maintain

attention for two-hour segments; (c) maintain regular attendance and be punctual within customary

tolerances, which are usually strict; (d) sustain an ordinary routine without special supervision; (e)

work in coordination with or proximity to others without being unduly distracted by them; (f) make

simple work-related decisions; (g) complete a normal workday and workweek without

interruptions from psychologically based symptoms and perform at a consistent pace without an

unreasonable number and length of rest periods, which "requirements are usually strict"; (h) ask

simple questions or request assistance; (*i*) accept instructions and respond appropriately to

criticism from supervisors; (j) get along with coworkers or peers without unduly distracting them

or exhibiting behavioral extremes; (k) respond appropriately to changes in a routine work setting;

and, (*l*) be aware of normal hazards and take appropriate precautions. *Id.* § 25020.010(B)(3). There is no record evidence that Dr. Pilla opined that Mr. Cano retained the unimpaired ability to perform any of these other functions, much less all of them.

The ALJ did observe that, per Dr. Pilla, Mr. Cano's mother expressed "disagreement with the disability paperwork" Dr. Pilla completed, and that Mr. Cano told Dr. Pilla's staff he "threw the paperwork."[27] (AR 15, 1122.) But these observations do not support the inference that Dr. Pilla opined that Mr. Cano can perform simple work, particularly where Dr. Pilla clearly indicated that the opinion with which Mr. Cano's mother disagreed was her opinion that Mr. Cano can follow simple instructions. (AR 1122.) Furthermore, there is no indication that the ALJ tried to develop the record by contacting Dr. Pilla to ask whether, in her opinion, Mr. Cano could perform all of the mental functions required for unskilled work. *See Thompson v. Sullivan*, 987 F.2d 1482, 1492 (10th Cir. 1993) (ALJ's "duty to develop the record pertains even if the claimant is represented by counsel"); *Baker v. Bowen,* 886 F.2d 289, 292 (10th Cir. 1989) (noting agency's "important burden of fully and fairly developing the record"). For these reasons, the ALJ's consideration of Dr. Pilla's opinion is not supported by substantial evidence.[28] *See Dix v. Berryhill*, No. 17-cv-2495, 2018 WL 2683784, at *4 (D. Kan. June 5, 2018) (ALJ erred where he did "not accurately state the opinion of" a medical source in his decision).

---

[27] The ALJ wrote that Mr. Cano told Dr. Pilla's staff "that he threw *away* the paperwork." (AR 15 (emphasis added).) However, the word "away" does not appear in Dr. Pilla's notes on this point. (AR 1122.)

[28] Also, in finding persuasive Dr. Pilla's purported opinion that Mr. Cano can perform simple work, the ALJ failed to explain why he discounted significantly probative or uncontroverted evidence that Mr. Cano is limited in many of the abilities required for such work. (AR 16.) In particular, the ALJ did not explain why he discounted the evidence discussed in Section III.A., *supra*. (AR 16.)

**IV.    CONCLUSION**

An ALJ must provide adequate reasons for the weight he gives a medical source opinion. *Frantz*, 509 F.3d at 1302-03; *Oldham*, 509 F.3d at 1258; *Haga*, 482 F.3d at 1207-09; *Givens*, 251 F. App'x at 568. Moreover, "all the ALJ's required findings must be supported by substantial evidence, and he must consider all relevant medical evidence in making those findings." *Grogan*, 399 F.3d at 1262 (quotation marks and citations omitted). Here, the ALJ failed to provide an adequate reason for rejecting DNP Ghebreslasse's opinion and failed to adequately explain why he discounted significantly probative evidence supporting that opinion. In addition, the ALJ's consideration of Dr. Pilla's opinion is not supported by substantial evidence. As such, the Court cannot determine whether the ALJ properly evaluated this evidence,[29] and remand is warranted. *Jensen*, 436 F.3d at 1165.

IT IS THEREFORE ORDERED that Mr. Cano's Motion to Reverse and Remand for Rehearing, with Supporting Memorandum (Doc. 24) is GRANTED, and this matter is remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

---

[29] Although the Commissioner has not argued harmless error with respect to the ALJ's treatment of the opinions of DNP Ghebreslasse and Dr. Pilla, (Doc. 28), the Court notes that had the ALJ properly assessed these opinions, he may have weighed them differently, which in turn may have led to a more restrictive RFC. Thus, the ALJ's errors were not harmless. *Cf. Mays v. Colvin*, 739 F.3d 569, 578-79 (10th Cir. 2014) (failure to provide adequate reasons for rejecting a medical source opinion "involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of [RFC]").